# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

SALESFORCE.COM, INC.

### SUMMONS IN A CIVIL CASE

**V.**

CASE NUMBER: CV-03556-WHA

THE COMPUTER MERCHANT, LTD.

AND RELATED COUNTERCLAIMS.

TO: (Name and address of defendant)

Astadia Consulting, LLC
16415 Addison Road
Suite 225
Addison, Texas 75001

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Ray E. Gallo
Gallo & Associates
5757 W. Century Blvd., 7th Flr.
Los Angeles, CA  90045

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgement by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

Richard W. Wieking
CLERK

DATE _____

(BY) DEPUTY CLERK

NDCAO440

1   Ray E. Gallo (State Bar No. 158903)
    **Gallo & Associates**
2   5757 W. Century Blvd., 7th Floor
    Los Angeles, CA 90045
3   Telephone: (310) 338-1114
    Facsimile: (310) 338-1199
4

5   Attorneys for Defendant,
    THE COMPUTER MERCHANT, LTD.
6

7             **UNITED STATES DISTRICT COURT**

8            **NORTHERN DISTRICT OF CALIFORNIA**

9              **SAN FRANCISCO DIVISION**

10

| | |
|---|---|
| 11  SALESFORCE.COM, INC., a Delaware | Case No.: CV-03556-WHA |
| 12  corporation, | |
| 13            Plaintiff, | **COUNTERCLAIMS OF THE COMPUTER MERCHANT, LTD** |
| 14      vs. | **AGAINST SALESFORCE.COM, INC. AND ASTADIA CONSULTING, LLC** |
| 15 | **FOR** |
| 16  THE COMPUTER MERCHANT, LTD., a |   1.  **FRAUD** |
|     Massachusetts corporation, |   2.  **BREACH OF IMPLIED** |
| 17 |       **WARRANTY OF FITNESS FOR** |
|             Defendant. |       **A PARTICULAR PURPOSE** |
| 18 |   3.  **BREACH OF EXPRESS** |
| 19  THE COMPUTER MERCHANT, LTD., a |       **WARRANTY** |
|     Massachusetts corporation, |   4.  **BREACH OF CONTRACT** |
| 20 |   5.  **BREACH OF IMPLIED** |
| 21           Counterclaimant. |       **COVENANT OF GOOD FAITH** |
| 22      vs. |       **AND FAIR DEALING** |
| |   6.  **VIOLATION OF THE UNFAIR** |
| 23  SALESFORCE.COM, INC., a Delaware |       **COMPETITION LAW** |
|     corporation; ASTADIA CONSULTING, LLC, |   7.  **FRAUD** |
| 24  a limited liability company, state of organization |   8.  **BREACH OF EXPRESS** |
| 25  unknown, and DOES 1 THROUGH 10. |       **WARRANTY** |
| |   9.  **BREACH OF CONTRACT** |
| 26          Counter Defendants,. |   10. **BREACH OF THE IMPLIED** |
| 27 |        **COVENANT OF GOOD FAITH** |
| |        **AND FAIR DEALING** |
| 28 |   11. **VIOLATION OF THE UNFAIR** |
| |        **COMPETITION LAW** |

Gallo & Associates
5757 W. Century Blvd. Suite 700
Los Angeles, CA 90045
(310) 338-1114

1

COUNTERCLAIM

Defendant and Counterclaimant The Computer Merchant, Ltd., a Massachusetts corporation ("TCM"), alleges:

## JURISDICTION AND VENUE

1. These are compulsory counterclaims as against Plaintiff Salesforce.com (also herein, "Salesforce"). This Court has jurisdiction of the original action predicated on 28 U.S.C. Section 1332 in that plaintiff and defendant are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds the sum of $150,000. TCM's counterclaims exceed that sum and arise out of fraud in the inducement by Salesforce.com in procuring the contract at issue in the Complaint as described more specifically below.

2. Astadia Consulting, LLC ("Astadia") is an indispensable party. Astadia was hired to implement the software Salesforce.com licensed to TCM as described in more specifically below. Together with Salesforce.com, Astadia represented it could do so and could achieve for TCM the results that TCM had been promised by Salesforce.com. Astadia's inability to do so, and to do so consistently with the cost represented, and without using third party software and having TCM host additional hardware all at further cost, inconvenience, and risk, is a central issue in determining the merits of the Complaint.

3. TCM further is informed and believes that Astadia regularly does business in California, and in the City and County of San Francisco, and otherwise within the Northern District, as a primary integrator relied upon by Salesforce.com to support Salesforce.com's customers.

4. Salesforce.com has its principal place of business in the City and County of San Francisco.

5. However, the fraudulent sale at issue was made in Massachusetts, where Salesforce.com falsely demonstrated to TCM that Salesforce.com's product had capabilities that it in fact does not have, and Astadia echoed those false representations. Further, Astadia's services were to be performed and were performed in a material part in Massachusetts at TCM's premises. Although Plaintiff alleges venue in the Northern District of California was chosen in the contract between

Gallo & Associates
5757 W. Century Blvd., Suite 700
Los Angeles, CA 90045
(310) 338-1114

2

1    TCM and Salesforce.com, that contract was procured by Salesforce.com's fraud. TCM therefore

2    reserves the right to move this Court for an appropriate change of venue.

3    　　　6. The true names and capacities of DOES 1 through 10 presently are unknown to Plaintiff.

4    Plaintiff will amend the complaint to allege their true identities if and when they are ascertained.

5    Plaintiff is informed and believes that each of DOES 1 through 10 was the agent, servant, employee,

6    employer, officer, director, co-conspirator, partner, principal, joint-venturer, or co-venturer of his

7    co-defendants and, in doing the things hereinafter alleged, was acting within the course and scope of

8    his employment and/or within his authority as agent, employee, principal, partner, co-conspirator, or

9    joint or co-venturer, and with the permission, ratification, or consent of his co-defendants. Plaintiff

10    is informed and believes that each of DOES 1 through 10 were in some manner responsible for the

11    below-described malfeasance, aiding and abetting their co-defendants.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

13
14    　　　7. Plaintiff, The Computer Merchant, Ltd. ("TCM") is a privately-held, Massachusetts
15    staffing firm specializing in the placement of Information Technology consultants in temporary and
16    permanent job assignments.

17    　　　8. Defendant, Salesforce.com, Inc. ("Salesforce"), is a large, publicly-held software
18    developer that markets and licenses a software application (the "Software") putatively designed to
19    allow companies like TCM to, among other things: track consultants' availability and clients' job
20    openings, match consultants to jobs based on their skills and location, and monitor the progress of
21    the consultants' work.

22    　　　9. In April 2006, Salesforce began aggressively marketing the Software to TCM as a
23    suitable replacement for TCM's current system. In connection with their discussions, TCM
24    furnished Salesforce with the source code for its system, as well as a detailed written list of its
25    specific business requirements. TCM further allowed Salesforce to interview its employees
26    concerning their daily tasks and needs.

27    　　　10.　　After purportedly analyzing all of that information, Salesforce's principal sales
28    engineer, Sal Caruso ("Caruso") advised TCM that the Software would enable TCM to perform its

Gallo & Associates
5757 W. Century Blvd., Suite 700
Los Angeles, CA 90045
(310) 338-1114

3

1   daily tasks far more effectively than TCM's current software and that TCM would benefit from

2   advanced built-in features of Salesforce.com's product including, but not limited to:

3       a)  the ability to search both consultant and client information using multiple keywords

4           simultaneously, to enable TCM to, among other things, easily match consultants to

5           assignments consistent with their technical skill sets;

6       b)  integration with internet-based map services, such as Google Maps, to allow

7           TCM to place candidates in nearby assignments;

8       c)  a user interface that would allow TCM's employees to simultaneously view

9           many pieces of related data, such as resumes and job descriptions;

10      d)  the ability to constantly monitor information and alert TCM's employees to

11          important items, such as new client assignments, without any prompting by

12          the user.

13      e)  ease of business process configuration, repurposing of standard Salesforce

14          features and application extension utilizing AppExchange (on demand

15          business applications), all without the need for software development.

16      f)  seamless integration of the Salesforce platform to TCM's other computer

17          systems and software.

18

19  Mr. Caruso made these statements to, among others, TCM's president, John Danieli ("Danieli") and

20  its Vice Presidents, Jay and Angela Powell (the "Powells"), during meetings held at TCM's site in

21  Norwell, Massachusetts in early May, 2006.  These statements were false when made and remain so

22  today.

23      11.  As part of this sales pitch, Salesforce even staged an elaborate demonstration of its

24  Software at TCM's offices on or about May 5, 2006 during which it purported to demonstrate these

25  features and others using information taken from TCM's databases.   That demonstration was

26  deliberately calculated and designed to mislead TCM as to the Software's capabilities as applied to

27  TCM's business.   The Software cannot perform for TCM the functions represented in paragraph 10

28

1 | above and purportedly demonstrated on or about May 5, 2006 at TCM's offices without additional
2 | hardware, software, and/or expensive custom software programming.
3 |     12.    In addition, Salesforce falsely advised TCM that its Software would be "hosted" off-
4 | site, i.e., that it would run on servers owned and operated by Salesforce. This offered two key
5 | benefits: (a) it would save TCM substantial amounts of money as it would not need to purchase,
6 | operate, or maintain new hardware; and (b) the risk of system disruption due to hardware failure
7 | would be reduced as there would be fewer pieces of equipment involved. But it proved to be false,
8 | at least as applied to TCM. All of the above-alleged misrepresentations by Salesforce.com were
9 | made with the specific intent to defraud TCM.
10 |     13.    During the course of its efforts to fraudulently sell the Software to TCM, Salesforce
11 | introduced TCM to its so-called "premier" installation partner, GrowthCircle, LLC
12 | ("GrowthCircle"). TCM's principals met with GrowthCircle's Managing Partner, Matthew Bruce
13 | ("Bruce"), among others, during May and June, 2006 at TCM. During the course of those meetings,
14 | Bruce joined Salesforce.com in falsely advising TCM that the Software would be up and running in
15 | just three months, i.e., by Fall, 2006, as its basic design was already well-suited to TCM's needs and
16 | required only minor "configuration." Bruce also agreed with and reiterated Salesforce's "pitch"
17 | regarding the Software's functionality, as described above. Salesforce's Caruso was present at these
18 | meetings and in turn agreed with Bruce's representations, thus making Salesforce's fraudulent
19 | misrepresentations yet again. Bruce's statements were specifically intended to induce TCM's
20 | reliance and to cause TCM to license Salesforce.com's software and contract with GrowthCircle to
21 | implement that software at a substantial revenue and profit to GrowthCircle.
22 |     14.    TCM reasonably relied on Salesforce's and GrowthCircle's representations as to the
23 | functionality, suitability, cost, and ease of installation of the Software. As a result, TCM executed a
24 | "Master Subscription Agreement" ("MSA") with Salesforce, which provided for the purchase of
25 | 125 user licenses at a total cost of $738,556.25 over three years. A copy of the MSA is attached
26 | hereto as Exhibit "A." TCM even paid $288,133.01 up front for the first year of the three year
27 | subscription, although as described below TCM never received anything of value.
28 |

Gallo & Associates
5757 W. Century Blvd., Suite 700
Los Angeles, CA 90045
(310) 338-1114

1    15.    At Salesforce's request and in reliance on the false representations set forth above,

2  TCM also entered into a "Professional Services Agreement" ("PSA") (a copy of which is attached

3  as Exhibit "B" hereto) with GrowthCircle, for the implementation of the Software.

4    16.    Shortly after TCM signed the Professional Services Agreement, GrowthCircle

5  merged with a Texas company called MW Advisors, LLC to form the resulting defendant company,

6  Astadia Consulting, LLC ("Astadia"). Astadia is the legal successor to GrowthCircle. It continued

7  working under the Professional Services Agreement and, as successor-in-interest to GrowthCircle,

8  assumed the PSA and all liabilities to TCM.

9    17.    Soon after Astadia began its implementation work in the fall of 2006 TCM

10  discovered that Salesforce's and Astadia's express representations about the Software's features,

11  suitability, integration, and ease of installation were false. Astadia struggled and ultimately failed to

12  implement the Software, and was finally forced to admit and admitted that:

13  a) the basic version of the Software would never be able to perform many of the tasks

14       necessary to meet TCM's known requirements, including some which Salesforce had

15       purported to demonstrate live to TCM, such as its resume or candidate search

16       capabilities;

17  b) the Software could <u>not</u> be installed in three months, and — rather than merely

18       "configuring" the system as promised — Astadia would have to develop  extensive

19       custom software code; and

20  c) Salesforce.com's Software could not be used alone but required integration with

21       other software in three separately hosted software components at additional and

22       previously undisclosed expense to meet TCM's known requirements. To implement

23       the Software, TCM also would be forced to purchase third-party hardware at a cost

24       of $86,807.31 <u>and</u> assume projected operating costs of another $120,000 every year,

25       costs that were not disclosed by Counter Defendants before the contracts at issue

26       were signed. On-site hosting would dramatically increase the risk of system failure

27       due to many pieces of hardware being cobbled together. It also would stunt

28

Gallo & Associates
5757 W. Century Blvd., Suite 700
Los Angeles, CA 90045
(310) 338-1114

6

1    processing speed resulting in a slower software application and resulting decreased

2    productivity for TCM's sales people.

3                              **FIRST CLAIM FOR RELIEF**

4                                      **FRAUD**

5                              **(AGAINST SALESFORCE)**

6    18.    TCM repeats paragraphs 1 through 17.

7    19.    As set forth more fully above, to induce TCM to purchase its Software, Salesforce

8    materially misrepresented, among other things, its functionality, suitability, the ease of transition

9    from TCM's current system, and the decreased costs and risks associated with off-site hosting.

10    20.    At the time it made these misrepresentations, Salesforce knew or reasonably should

11    have known each one was patently false.  Salesforce.com nevertheless deliberately misled TCM as

12    to the features, benefits, and costs associated with its Software with the fraudulent intent to make a

13    sale and to obtain the resulting financial benefits regardless of the suitability of its software to

14    TCM's needs.

15    21.    TCM reasonably relied on these representations and consequently has suffered

16    damages, including spending time and money in licensing and seeking to implement Salesforce's

17    Software which, in fact, cannot meet TCM's business needs as disclosed to Salesforce.com before

18    the MSA and PSA were signed.

19    22.    Salesforce.com's actions as alleged herein were malicious, oppressive, and

20    fraudulent entitling TCM to punitive or exemplary damages.

21                              **SECOND CLAIM FOR RELIEF**

22                         **BREACH OF IMPLIED WARRANTY OF**

23                       **FITNESS FOR A PARTICULAR PURPOSE**

24                              **(AGAINST SALESFORCE)**

25    23.    TCM repeats paragraphs 1 through 17.

26    24.    TCM purchased Salesforce's Software to facilitate the recruitment and placement of

27    consultants and to gain advanced new features not available under its current system.

28

Gallo & Associates
5757 W. Century Blvd., Suite 700
Los Angeles, CA 90045
(310) 338-1114

7

COUNTERCLAIM

25.    TCM relied on Salesforce's skill and judgment in touting the Software as a suitable product for TCM's known needs, which TCM disclosed in detail and in writing to Salesforce.com before executing either the MSA or PSA.  TCM purchased only based on Salesforsce.com's express and implied warranties that Salesforce.com's Software met those known needs.

26.    Salesforce breached the warranty of fitness for a particular purpose by selling TCM a software application that did not and could not perform as promised, and as needed by TCM, because it lacked basic features TCM needed and disclosed it needed, and Salesforce.com knew TCM needed, and otherwise was suitable for use in TCM's business.

27.    As a direct and proximate resultof Salesforce's breach of this warranty, TCM has suffered damages in expending time and money to acquire the right to implement and to attempt to implement  an unsuitable software application.

### THIRD CLAIM FOR RELIEF

### BREACH OF EXPRESS WARRANTY

### (AGAINST SALESFORCE)

28.    TCM repeats paragraphs 1 through 17.

29.    Salesforce expressly warranted that its Software would meet TCM's stated needs, including but not limited to tracking consultants' availability and clients' job postings and matching consultants to jobs based on geographical location and technical skill sets through a single search. The Software failed to perform and in fact cannot perform these functions and others as warranted.

30.    As a direct and proximate resultof Salesforce's breach of this warranty, TCM has suffered damages in expending time and money to acquire the right to implement and to attempt to implement  an unsuitable software application.

### FOURTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

### (AGAINST SALESFORCE)

31.    TCM repeats paragraphs 1 through 17.

32.    TCM maintains that its contract with Salesforce was procured by fraud based on the material misrepresentations detailed above and is thus void or voidable and subject to rescission.  To

1  the extent TCM and Salesforce had a contract, however, Salesforce breached it by, among other

2  things, supplying an application that was utterly devoid of the functionality, ease of configuration,

3  and cost advantages promised, and was otherwise not suitable for use in TCM's business.

4       33.    As a direct and proximate result of Salesforce's breaches, TCM has suffered

5  damages in expending time and money to acquire the right to implement and to attempt to

6  implement  an unsuitable software application.

7  ### FIFTH CLAIM FOR RELIEF

8  ### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

9  ### (AGAINST SALESFORCE)

10       34.    TCM repeats paragraphs 1 through 17.

11       35.    TCM maintains that its contract with Salesforce was procured by fraud based on the

12  material misrepresentations detailed above and is thus void or voidable and subject to rescission.  To

13  the extent TCM and Salesforce had a contract, however, it contained an implied covenant of good

14  faith and fair dealing.

15       36.    Salesforce breached the implied covenant of good faith and fair dealing by failing to

16  provide or even to make a good faith attempt to provide the promised benefits of the contract.

17       37.    As a direct and proximate result of Salesforce's breach, TCM has suffered damages

18  in expending time and money to acquire the right to implement and to attempt to implement  an

19  unsuitable software application.

20  ### SIXTH CLAIM FOR RELIEF

21  ### VIOLATION OF THE UNFAIR COMPETITION LAW

22  ### (AGAINST SALESFORCE)

23       38.    TCM repeats paragraphs 1 through 17.

24       39.    Salesforce's conduct as described above, including its numerous misrepresentations

25  and breaches of warranty, constitute unfair, unlawful, and fraudulent practices within the meaning

26  of Business & Professions  Code §17200 et seq., known as the Unfair Competition Law (or "UCL")

27

28

40.     As a direct and proximate result of Salesforce's violations of §17200, TCM has lost money or property consisting of the sums spent to acquire the right to implement and to attempt to implement Salesforce.com's Software.

## SEVENTH CLAIM FOR RELIEF

## FRAUD

## (AGAINST ASTADIA)

41.     TCM repeats paragraphs 1 through 17.

42.     As set forth more fully above, to induce TCM to enter into an agreement to install the Software, Astadia's predecessor-in-interest, GrowthCircle, misrepresented to TCM that the system would be operable in three months and would offer the benefits and features that Salesforce had promised.

43.     At the time it made these representations, GrowthCircle knew or reasonably should have known that each was false.  GrowthCircle made these misrepresentations with the specific intent to induce TCM's reliance and did so maliciously, fraudulently, and oppressively seeking its own financial advantage, i.e., to make a sale.

44.     TCM reasonably relied on these representations and, as a result, has suffered damages in that it expended time and money to acquire the rights to implement and to attempt to implement Salesforce.com's Software.

45.     Astadia has succeeded to the liabilities of GrowthCircle.

## EIGHT CLAIM FOR RELIEF

## BREACH OF EXPRESS WARRANTY

## (AGAINST ASTADIA)

46.     TCM repeats paragraphs 1 through 17 and 42 through 44.

47.     Astadia expressly warranted that it could implement the Software within three months and that the resulting application would perform all of the functions requested by TCM and touted by Salesforce.  Astadia failed to ever implement the system, could not implement the system to perform as promised, and ultimately admitted to TCM that it could not comply with its express warranties to TCM.

1    48.    As a direct and proximate result of Astadia's breaches of warranty, TCM has

2  suffered damages in that it expended time and money to acquire the rights to implement and to

3  implement Salesforce.com's Software.

4                                 **NINTH CLAIM FOR RELIEF**

5                                 **BREACH OF CONTRACT**

6                                   **(AGAINST ASTADIA)**

7    49.    TCM repeats paragraphs 1 through 17 and 42 through 44.

8    50.    TCM maintains that its contract with GrowthCircle, later Astadia, was procured by

9  fraud based on the material misrepresentations detailed above and is thus void.  To the extent there

10  was a contract, however, Astadia breached it by, among other things, failing to install the Software

11  on time or in a manner consistent with the terms of the contract.

12    51.    As a direct and proximate result of Astadia's breaches, TCM has suffered damages in

13  that it expended time and money to acquire the rights to implement and/or to implement

14  Salesforce.com's Software.

15                                 **TENTH CLAIM FOR RELIEF**

16    **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

17                                   **(AGAINST ASTADIA)**

18    52.    TCM repeats paragraphs 1 through 17 and 42 through 44.

19    53.    TCM maintains that its contract with GrowthCircle, later Astadia, was procured by

20  fraud based on the material misrepresentations detailed above and is thus void.  To the extent there

21  was a contract, however, it contained an implied covenant of good faith and fair dealing.

22    54.    Astadia breached the implied covenant of good faith and fair dealing by failing to

23  provide any of the promised benefits of the contract.

24    55.    As a direct and proximate result of Astadia's breach, TCM has suffered damages in

25  that it expended time and money to acquire the rights to implement and/or to implement

26  Salesforce.com's Software.

27  //

28  //

Gallo & Associates
5757 W. Century Blvd., Suite 700
Los Angeles, CA 90045
(310) 338-1114

COUNTERCLAIM

**ELEVENTH CLAIM FOR ELIEF**

**VIOLATION OF THE UNFAIR COMPETITION LAW**

**(AGAINST ASTADIA)**

56.    TCM repeats paragraphs 1 through 17 and 42 through 44.

57.    Astadia's conduct as described above, including its numerous misrepresentations and its breaches of warranty, constitute unfair, unlawful, or fraudulent acts within the meaning of California Business & Professions Code §17200.

58.    As a direct and proximate result of Astadia's violations of the UCL, TCM has lost money or property.

**PRAYER FOR RELIEF**

Wherefore, Counterclaimant TCM, as and to the extent supported by the applicable foregoing claims for relief, prays that the Court:

1. Rescind the MSA and all related agreements between TCM and Salesfore.com;

2. Rescind the PSA and all related agreements between TCM and Astadia;

3. Award TCM damages according to proof;

4. Order that Counter-Defendants disgorge and Restore to TCM all sums obtained by them in violation of the Unfair Competition Law;

5. Award punitive damages to TCM in an amount sufficient to punish Counter-Defendants for their fraud;

6. Award Costs of suit;

7. Order such other and further relief as the Court deems just and proper.

GALLO & ASSOCIATES

Dated: August 14, 2007        By: _____
                                   Ray E. Gallo
                                   Attorneys for Defendant,
                                   THE COMPUTER MERCHANT, LTD.

Gallo & Associates
5757 W. Century Blvd. Suite 700
Los Angeles, CA 90045
(310) 338-1114

CONFIDENTIAL



## MASTER SUBSCRIPTION AGREEMENT

This Master Subscription Agreement ("**Agreement**") is entered into and effective as of May 31 , 2006 ("**Effective Date**") by and between **salesforce.com, inc.**, a Delaware corporation, having its principal place of business at The Landmark @ One Market, Suite 300, San Francisco, California 94105 ("**SFDC**") and The Computer Merchant, a **Massachusetts** corporation, having its principal place of business at 95 Longwater Circle, Norwell, MA 02061 ("**Customer**").

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### 1. Definitions.

"**Customer Data**" means all electronic data or information submitted by Customer to the Service.

"**Order Form**" means the ordering documents representing the initial purchase of the Service as well as any subsequent purchases agreed to between the parties in writing from time to time, that are executed hereunder and deemed incorporated into Exhibit A from time to time and that specify, among other things, the number of subscriptions ordered, the subscription term and the applicable fees.

"**Service**" means the online, Web-based customer relationship management service, including associated offline components, provided by SFDC via http://www.salesforce.com and/or other designated websites.

"**User Guide**" means the online user guide for the Service, accessible via http://www.salesforce.com, as updated from time to time.

"**Users**" means Customer's employees, consultants, contractors or agents who are authorized to use the Service and have been supplied user identifications and passwords by Customer (or by SFDC at Customer's request).

### 2. Service.

**2.1    Provision of Service.** SFDC shall make the Service available to Customer pursuant to the terms and conditions set forth in this Agreement and any and all Order Forms executed hereunder from time to time.  During the term of this Agreement, (i) the Service shall perform materially in accordance with the User Guide, and (ii) the functionality of the Service will not be materially decreased from that available as of the Effective Date.  Customer agrees that its purchase of subscriptions is not contingent upon the delivery of any future functionality or features nor is it dependent upon any oral or written public comments made by SFDC with respect to future functionality or features.

**2.2    Additional Users.** User subscriptions are for named Users and cannot be shared or used by more than one User but may be reassigned from time to time to new Users replacing former Users who have terminated an employment or some other prior relationship with Customer, changed job status or function, or otherwise no longer require ongoing use of the Service.  Unless otherwise specified in the relevant Order

Form (i) additional User subscriptions must be added in minimum increments of 5 units; (ii) the term of the additional User subscriptions shall be coterminous with the expiration of the then current subscription term; and (iii) pricing for the additional User subscriptions shall be the same as that for the pre-existing subscriptions, prorated for the remainder of the then current subscription term.

### 3. Use of the Service.

**3.1    SFDC Responsibilities.** SFDC shall: (i) in addition to its confidentiality obligations under Section 6, not use, edit or disclose to any party other than Customer the Customer Data; (ii) maintain the security and integrity of the Service and the Customer Data; (iii) provide telephone and online standard support to Customer's Users, at no additional charge; and (iv) use commercially reasonable efforts to make the Service generally available 24 hours a day, 7 days a week, except for: (a) planned downtime (of which SFDC shall give at least 8 hours notice via the Service and which SFDC shall schedule to the extent reasonably practicable during the weekend hours from 6:00 p.m. PT Friday to 3:00 a.m. PT Monday); or (b) any unavailability caused by circumstances beyond SFDC's reasonable control, including without limitation, acts of God, acts of government, flood, fire, earthquakes, civil unrest, acts of terror, strikes or other labor problems (other than those involving SFDC employees), computer, telecommunications, Internet service provider or hosting facility failures or delays involving hardware, software or power systems not within SFDC's possession or reasonable control, and network intrusions or denial of service attacks.

**3.2    Customer Responsibilities.** Customer is responsible for all activities that occur under Customer's User accounts. Customer shall:  (i) have sole responsibility for the accuracy, quality, integrity, legality, reliability, and appropriateness of all Customer Data; (ii) use commercially reasonable efforts to prevent unauthorized access to, or use of, the Service, and notify SFDC promptly of any such unauthorized use; and (iii) comply with all applicable local, state, federal, and foreign laws in using the Service and, if using the Service outside of the United States, not use the Service in a manner that would violate any federal or state laws of the United States if conducted therein.

**3.3    Use Guidelines.** Customer shall use the Service solely for its internal business purposes as contemplated by this Agreement and shall not: (i) license, sublicense, sell, resell, rent, lease, transfer, assign, distribute, time share or

$\mathcal{E}x.A$

CONFIDENTIAL



## MASTER SUBSCRIPTION AGREEMENT

otherwise commercially exploit or make the Service available to any third party, other than as contemplated by this Agreement; (ii) send spam or otherwise duplicative or unsolicited messages in violation of applicable laws; (iii) send or store infringing, obscene, threatening, libelous, or otherwise unlawful or tortious material, including material harmful to children or violative of third party privacy rights; (iv) send or store material containing software viruses, worms, Trojan horses or other harmful computer code, files, scripts, agents or programs; (v) interfere with or disrupt the integrity or performance of the Service or the data contained therein; or (vi) attempt to gain unauthorized access to the Service or its related systems or networks.

**3.4    Third-Party Providers.** Certain third-party providers, some of which may be listed on pages within SFDC's website, offer products and services related to the Service, including implementation, customization and other consulting services related to customers' use of the Service and applications (both offline and online) that work in conjunction with the Service, such as by exchanging data with the Service or by offering additional functionality within the user interface of the Service through use of the Service's application programming interface. SFDC does not warrant any such third-party providers or any of their products or services, whether or not such products or services are designated by SFDC as "certified," "validated" or otherwise. Any exchange of data or other interaction between Customer and a third-party provider, and any purchase by Customer of any product or service offered by such third-party provider, is solely between Customer and such third-party provider. In addition, from time to time, certain additional functionality (not defined as part of the Service) may be offered by SFDC to Customer, for an additional fee, on a pass-through or OEM basis pursuant to terms specified by the licensor and agreed to by Customer in connection with a separate purchase by Customer of such additional functionality. Customer's use of any such additional functionality shall be governed by such terms, which shall prevail in the event of any inconsistency with the terms of this Agreement.

**3.5    Privacy Statement.** SFDC's privacy statement is set forth in Exhibit B and incorporated herein by this reference.

**3.6    Publicity.** Neither party may issue press releases relating to this Agreement without the other party's prior written consent. Either party may include the name and logo of the other party in lists of customers or vendors in accordance with the other party's standard guidelines.

## 4.    Fees & Payment.

**4.1    User Fees.** Customer shall pay all fees specified in all executed Order Forms hereunder. Except as otherwise provided, all fees are quoted in United States dollars. Fees are based on the number of User subscriptions purchased in the relevant Order Form, not the extent of actual usage. Except as otherwise provided, fees are non-refundable, and the number of subscriptions purchased cannot be decreased during the relevant subscription term stated on the Order Form. Because fees are based on monthly units, fees for subscriptions purchased in the middle of a monthly period will be charged for that monthly period in full and going forward based on the number of monthly periods remaining in the subscription term.

**4.2    Invoicing & Payment.** Fees for the Service will be invoiced in advance and otherwise in accordance with the terms set forth in the relevant Order Form. Unless otherwise stated in the Order Form, charges are due net 30 days from the invoice date. Unless otherwise stated in the Order Form, all payments made under this Agreement shall be in United States dollars.

**4.3    Overdue Payments.** Any payment not received from Customer by the due date may accrue (except with respect to charges then under reasonable and good faith dispute), at SFDC's discretion, late charges at the rate of 1.5% of the outstanding balance per month, or the maximum rate permitted by law, whichever is lower, from the date such payment was due until the date paid.

**4.4    Suspension of Service.** If Customer's account is 30 days or more overdue (except with respect to charges then under reasonable and good faith dispute), in addition to any of its other rights or remedies, SFDC reserves the right to suspend the Service provided to Customer, without liability to Customer, until such amounts are paid in full.

**4.5    Taxes.** Unless otherwise stated, SFDC's fees do not include any local, state, federal or foreign taxes, levies or duties of any nature ("Taxes"). Customer is responsible for paying all Taxes, excluding only taxes based on SFDC's income. If SFDC has the legal obligation to pay or collect Taxes for which Customer is responsible under this section, the appropriate amount shall be invoiced to and paid by Customer unless Customer provides SFDC with a valid tax exemption certificate authorized by the appropriate taxing authority.

**4.6    Billing and Contact Information.** Customer shall maintain complete and accurate billing and contact information on the Service at all times.

CONFIDENTIAL



## MASTER SUBSCRIPTION AGREEMENT

### 5.  Proprietary Rights.

**5.1     Reservation of Rights.** Customer acknowledges that in providing the Service, SFDC utilizes (i) the salesforce.com name, the salesforce.com logo, the salesforce.com domain name, the product and service names associated with the Service, and other trademarks and service marks; (ii) certain audio and visual information, documents, software and other works of authorship; and (iii) other technology, software, hardware, products, processes, algorithms, user interfaces, know-how and other trade secrets, techniques, designs, inventions and other tangible or intangible technical material or information (collectively, **"SFDC Technology"**) and that the SFDC Technology is covered by intellectual property rights owned or licensed by SFDC (collectively, **"SFDC IP Rights"**). Other than as expressly set forth in this Agreement, no license or other rights in or to the SFDC Technology or SFDC IP Rights are granted to Customer, and all such licenses and rights are hereby expressly reserved.

**5.2     License Grant.** SFDC grants Customer and its Users a worldwide, non-exclusive, non-transferable (except in connection with a permitted assignment of this Agreement), non-sublicenseable right to access and use the Service in accordance with the terms of this Agreement.

**5.3     Restrictions.** Customer shall not (i) modify, copy or create derivative works based on the Service or SFDC Technology; (ii) create Internet "links" to or from the Service, or "frame" or "mirror" any content forming part of the Service, other than on Customer's own intranets or otherwise for its own internal business purposes; or (iii) disassemble, reverse engineer, or decompile the Service or SFDC Technology, or access it in order to (A) build a competitive product or service, (B) build a product or service using similar ideas, features, functions or graphics of the Service, or (C) copy any ideas, features, functions or graphics of the Service. Subsections 5.3 (i) and (ii) shall not be interpreted to prohibit Customer from integrating the Service with other applications, including those provided by third parties.

**5.4     Customer Data.** As between SFDC and Customer, all Customer Data is owned exclusively by Customer. Customer Data shall be considered Confidential Information subject to the terms of this Agreement. SFDC may access Customer's User accounts, including Customer Data, solely to respond to service or technical problems or at Customer's request.

**5.5     Suggestions.** SFDC shall have a royalty-free, worldwide, perpetual license to use or incorporate into the Service any suggestions, ideas, enhancement requests, feedback, recommendations or other information provided by Customer or its Users relating to the operation of the Service.

### 6.  Confidentiality.

**6.1     Definition of Confidential Information.** As used herein, "Confidential Information" means all confidential and proprietary information of a party ("Disclosing Party") disclosed to the other party ("Receiving Party"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure, including the terms and conditions of this Agreement (including pricing and other terms reflected in all Order Forms hereunder), the Customer Data, the Service, the SFDC Technology, business and marketing plans, technology and technical information, product designs, and business processes. Confidential Information (except for Customer Data) shall not include any information that: (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party; (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (iii) was independently developed by the Receiving Party without breach of any obligation owed to the Disclosing Party; or (iv) is received from a third party without breach of any obligation owed to the Disclosing Party.

**6.2     Confidentiality.** The Receiving Party shall not disclose or use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, except with the Disclosing Party's prior written permission.

**6.3     Protection.** Each party agrees to protect the confidentiality of the Confidential Information of the other party in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind, but in no event shall either party exercise less than reasonable care in protecting such Confidential Information.

**6.4     Compelled Disclosure.** If the Receiving Party is compelled by law to disclose Confidential Information of the Disclosing Party, it shall provide the Disclosing Party with prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure.

**6.5     Remedies.** If the Receiving Party discloses or uses (or threatens to disclose or use) any Confidential Information of the Disclosing Party in breach of this Section 6, the Disclosing Party shall have the right, in addition to any other remedies available to it, to seek injunctive relief to enjoin such

CONFIDENTIAL



**MASTER SUBSCRIPTION AGREEMENT**

acts, it being specifically acknowledged by the parties that any other available remedies are inadequate.

### 7. Warranties & Disclaimers.

**7.1    Warranties.** Each party represents and warrants that it has the legal power to enter into this Agreement. SFDC represents and warrants that (i) it will provide the Service in a manner consistent with general industry standards reasonably applicable to the provision thereof; (ii) it owns or otherwise has sufficient rights to the Service and the SFDC Technology to grant the rights and licenses granted herein; and (iii) the Service and SFDC Technology do not infringe any intellectual property rights of any third party.

**7.2    Disclaimer.** EXCEPT AS EXPRESSLY PROVIDED HEREIN, SFDC MAKES NO WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. SFDC HEREBY SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW.

### 8. Mutual Indemnification.

**8.1    Indemnification by SFDC.** Subject to this Agreement, SFDC shall defend, indemnify and hold Customer harmless against any loss or damage (including reasonable attorneys' fees) incurred in connection with claims, demands, suits, or proceedings ("Claims") made or brought against Customer by a third party alleging that the use of the Service as contemplated hereunder infringes the intellectual property rights of a third party; provided, that Customer (a) promptly gives written notice of the Claim to SFDC; (b) gives SFDC sole control of the defense and settlement of the Claim (provided that SFDC may not settle or defend any Claim unless it unconditionally releases Customer of all liability); and (c) provides to SFDC, at SFDC's cost, all reasonable assistance.

**8.2    Indemnification by Customer.** Subject to this Agreement, Customer shall defend, indemnify and hold SFDC harmless against any loss or damage (including reasonable attorneys' fees) incurred in connection with Claims made or brought against SFDC by a third party alleging that the Customer Data or Customer's use of the Service (as opposed to the Service itself) infringes the intellectual property rights of, or has otherwise harmed, a third party; provided, that SFDC (a) promptly gives written notice of the Claim to Customer; (b) gives Customer sole control of the defense and

settlement of the Claim (provided that Customer may not settle or defend any Claim unless it unconditionally releases SFDC of all liability); and (c) provides to Customer, at Customer's cost, all reasonable assistance.

### 9. Limitation of Liability.

**9.1    Limitation of Liability.** IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE LESSER OF $500,000 OR THE AMOUNTS ACTUALLY PAID BY AND DUE FROM CUSTOMER HEREUNDER.

**9.2    Exclusion of Consequential and Related Damages.** IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS, LOSS OF USE, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES HOWEVER CAUSED AND, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

**9.3    Limitation of Action.** Except for actions for non-payment or breach of either party's intellectual property rights, no action (regardless of form) arising out of this Agreement may be commenced by either party more than two (2) years after the cause of action has accrued.

### 10. Term & Termination.

**10.1    Term of Agreement.** This Agreement commences on the Effective Date and continues until all User subscriptions granted in accordance with this Agreement have expired or been terminated.

**10.2    Term of User Subscriptions.** User subscriptions commence on the start date specified in the relevant Order Form and continue for the subscription term specified therein. User subscriptions shall automatically renew for additional periods of one (1) year at the list price in effect at the time of renewal unless Customer gives SFDC notice of termination at least 30 days prior to the end of the relevant subscription term.

**10.3    Termination for Cause.** A party may terminate this Agreement for cause: i) upon 30 days written notice of a material breach to the other party if such breach remains uncured at the expiration of such period; or (ii) if the other

CONFIDENTIAL



MASTER SUBSCRIPTION AGREEMENT

party becomes the subject of a petition in bankruptcy or any other proceeding relating to insolvency, receivership, liquidation or assignment for the benefit of creditors. Upon any termination for cause by Customer, SFDC shall refund Customer any prepaid fees for the remainder of the subscription term after the date of termination.

**10.4    Outstanding Fees.** Termination shall not relieve Customer of the obligation to pay any fees accrued or payable to SFDC prior to the effective date of termination.

**10.5    Return of Customer Data.** Upon request by Customer made within 30 days of the effective date of termination, SFDC will make available to Customer for download a file of Customer Data in comma separated value (.csv) format. After such 30-day period, SFDC shall have no obligation to maintain or provide any Customer Data and shall thereafter, unless legally prohibited, delete all Customer Data in its systems or otherwise in its possession or under its control.

**10.6    Surviving Provisions.** The following provisions shall survive any termination or expiration of this Agreement: Sections 4, 5 (excluding Section 5.2), 6, 7, 8, 9, 10 and 11.

**11. General Provisions.**

**11.1    Relationship of the Parties.** This Agreement does not create a partnership, franchise, joint venture, agency, fiduciary or employment relationship between the parties.

**11.2    No Third-Party Beneficiaries.** There are no third-party beneficiaries to this Agreement.

**11.3    Notices.** All notices under this Agreement shall be in writing and shall be deemed to have been given upon: (i) personal delivery; (ii) the second business day after mailing; (iii) the second business day after sending by confirmed facsimile; or (iv) the second business day after sending by email. Notices to SFDC shall be addressed to the attention of its VP, Finance – Worldwide Sales Operations, with a copy to its General Counsel. Notices to Customer are to be addressed "Attn: _____."

**11.4    Waiver and Cumulative Remedies.** No failure or delay by either party in exercising any right under this Agreement shall constitute a waiver of that right. Other than as expressly stated herein, the remedies provided herein are in addition to, and not exclusive of, any other remedies of a party at law or in equity.

**11.5    Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision shall be modified by the court and interpreted so as best to accomplish the objectives of the original provision to the fullest extent permitted by law, and the remaining provisions of this Agreement shall remain in effect.

**11.6    Assignment.** Neither party may assign any of its rights or obligations hereunder, whether by operation of law or otherwise, without the prior express written consent of the other party. Notwithstanding the foregoing, either party may assign this Agreement together with all rights and obligations hereunder, without consent of the other party, in connection with a merger, acquisition, corporate reorganization, or sale of all or substantially all of its assets not involving a direct competitor of the other party. Any attempt by a party to assign its rights or obligations under this Agreement in breach of this section shall be void and of no effect. Subject to the foregoing, this Agreement shall bind and inure to the benefit of the parties, their respective successors and permitted assigns.

**11.7    Governing Law.** This Agreement shall be governed exclusively by the internal laws of the State of California, without regard to its conflicts of laws rules.

**11.8    Venue.** The state and federal courts located in San Francisco County, California shall have exclusive jurisdiction to adjudicate any dispute arising out of or relating to this Agreement. Each party hereby consents to the exclusive jurisdiction of such courts. Each party also hereby waives any right to jury trial in connection with any action or litigation in any way arising out of or related to this Agreement.

**11.9    Export Control Laws.** Each party shall comply with all United States and foreign export control laws or regulations applicable to its performance under this Agreement.

**11.10    Entire Agreement.** This Agreement, including all exhibits and addenda hereto and all Order Forms executed hereunder, constitutes the entire agreement between the parties, and supersedes all prior and contemporaneous agreements, proposals or representations, written or oral, concerning its subject matter. No modification, amendment, or waiver of any provision of this Agreement shall be effective unless in writing and signed by the party against whom the modification, amendment or waiver is to be asserted. In the event of any conflict between the provisions in this Master Subscription Agreement and any exhibit or addendum hereto, or Order Form executed hereunder, the terms of such exhibit, addendum or Order Form shall prevail to the extent of any inconsistency. Notwithstanding any language to the contrary

**CONFIDENTIAL**



<u>**MASTER SUBSCRIPTION AGREEMENT**</u>

therein, no terms or conditions stated in a Customer purchase order or in any other Customer order documentation (excluding Order Forms) shall be incorporated into or form any part of this Agreement, and all such terms or conditions shall be null and void.

**11.11    Counterparts.** This Agreement may be executed in counterparts, which taken together shall form one legal instrument.

IN WITNESS WHEREOF, the parties' authorized signatories have duly executed this Agreement as of the Effective Date:

**SALESFORCE.COM, INC.**

By: _____

Print Name: _____

Title: _____

Date: _____

**CUSTOMER**

By:   *Angela M Powell*

Print Name:  _Angela M. Powell_

Title:    _VP/CFO_

Date:    _5/31/06_

<u>**EXHIBITS**</u>

Exhibit A:    Order Forms
Exhibit B:    Privacy Statement

CONFIDENTIAL



## MASTER SUBSCRIPTION AGREEMENT

### EXHIBIT A
### Order Forms

(to be attached hereto and incorporated herein from time to time upon execution)

CONFIDENTIAL



## MASTER SUBSCRIPTION AGREEMENT

### EXHIBIT B
### Privacy Statement

**Reproduced by Request of TRUSTe**

Privacy Statement Reproduced by request of TRUSTe. Salesforce.com, Inc., including salesforce.com Sàrl and other subsidiaries (collectively, "salesforce.com"), is a licensee of the TRUSTe Privacy Program. TRUSTe is an independent, nonprofit organization whose mission is to build users' trust and confidence in the Internet by promoting the use of fair information practices. Because this web site wants to demonstrate its commitment to your privacy, it has agreed to disclose its information practices and have its privacy practices reviewed for compliance by TRUSTe.

Any information you provide will be treated in accordance with Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with respect to the processing of personal data and on the free movement of such data (the "EU Data Protection Directive"), and any implementing and/or amending legislation as may be adopted in EU Member States from time to time, as well as the Swiss Data Protection Act of 19 June 1999 and any implementing and/or amending legislation that may be adopted from time to time.

This privacy statement complies with the Safe Harbor framework under the EU Data Protection Directive. In addition, salesforce.com self-certifies compliance with the Safe Harbor framework to the U.S. Department of Commerce.

Downloadable Software Disclaimer: The TRUSTe program covers only information that is collected through this Web site, and does not cover information that may be collected through software downloaded from the site.

If you have questions or concerns regarding this statement, you should first contact salesforce.com's security administrator by email at security@salesforce.com. If you do not receive acknowledgment of your inquiry or your inquiry has not been satisfactorily addressed, you should then contact TRUSTe http://www.truste.org/consumers/watchdog_complaint.php. TRUSTe will then serve as a liaison with the Web site to resolve your concerns.

**Salesforce.com Privacy Statement:**
Salesforce.com has created this privacy statement ("Statement") in order to demonstrate our commitment to customer privacy. Privacy on the salesforce.com web site (the "Site") is of great importance to us. Because we gather important information from our visitors and customers, we have established this Statement as a means to communicate our information gathering and dissemination practices. We reserve the right to change this Statement and will provide notification of the change at least thirty (30) business days prior to the change taking effect. To be effective, the change must first also be approved by TRUSTe, and will include directions on how users may respond to the change.

**Collected Information:**
We require customers who register to use the services offered on our Site (collectively, the "Service") to give us contact information, such as their name, company name, address, phone number, and e-mail address, and financial qualification and billing information, such as billing name and address, credit card number, and the number of users within the organization that will be using the Service. At the time you express interest in attaining additional information, or when you register for the Service, we may also ask for additional personal information, such as title, department name, fax number, or additional company information, such as annual revenues, number of employees, or industry. Customers can opt out of providing this additional information by not entering it when asked. Customers can update or remove their personal information at any time by logging into the Website and editing their Personal Information within Setup. Customers can view their updated profile to confirm their edits have been made.

Salesforce.com uses the information that we collect to set up the Service for individuals and their organizations. We may also use the information to contact customers to further discuss customer interest in our company, the Service that we provide, and to send information regarding our company or partners, such as promotions and events. Customers are invited to receive an email newsletter by providing an email address. Customer email addresses and any personal customer information will not be distributed or shared with third parties. Customers can opt out of being contacted by us, or receiving such information from us, at any time by sending an email to support@salesforce.com. Separately, customers are also asked to provide an email address when registering for the Service, in order to receive a username and password. We may also email information regarding updates to the Service or company, and will send a Customer Newsletter. Again, email will not be distributed or shared and customers can opt out of receiving any communication by emailing support@salesforce.com at the time it is distributed, or at the time any customer registers for the Service.

Except as we explicitly state at the time we request information, or as provided for in the salesforce.com Master Subscription Agreement, we do not disclose to third parties the information provided. All financial and billing information that we collect

**CONFIDENTIAL**



## MASTER SUBSCRIPTION AGREEMENT

through the Site is used solely to check the qualifications of prospective customers and to bill for the Service. This billing information is not used by salesforce.com for marketing or promotional purposes. Salesforce.com uses a third-party intermediary to manage the credit card processing. This intermediary is solely a link in the distribution chain, and is not permitted to store, retain, or use the information provided, except for the sole purpose of credit card processing. Other third parties, such as content providers, may provide content on the web Site but they are not permitted to collect any information nor does salesforce.com share user information with these parties.

Customers of the Service will be using the Site to host data and information ("Data"). Salesforce.com will not review, share, distribute, print, or reference any such Data except as provided in the salesforce.com Master Subscription Agreement, or as may be required by law. Individual records may at times be viewed or accessed only for the purpose of resolving a problem, support issue, or suspected violation of the Master Subscription Agreement, or as may be required by law. Of course, customers are responsible for maintaining the confidentiality and security of their user registration and password.

Salesforce.com may also collect certain information from visitors to and customers of the Site, such as Internet addresses. This information is logged to help diagnose technical problems, and to administer our Site in order to constantly improve the quality of the Service. We may also track and analyze non-identifying and aggregate usage and volume statistical information from our visitors and customers and provide such information to third parties.

If a user elects to use our referral service for informing a friend about our site, we ask them for the friend's name and email address. Salesforce.com will automatically send the friend a one-time email inviting them to visit the site. Salesforce.com does not store this information.

Cookies:
When you interact with the salesforce.com Website we strive to make that experience easy and meaningful. When you come to our Web site, our Web server sends a cookie to your computer. Cookies are files that Web browsers place on a computer's hard drive and are used to tell us whether customers and visitors have visited the Site previously.

Standing alone, cookies do not identify you personally. They merely recognize your browser. Unless you choose to identify yourself to salesforce.com, either by responding to a promotional offer, opening an account, or registering for a 30-day Test Drive, you remain anonymous to salesforce.com. Cookies come in two flavors: session and persistent-based. Session cookies exist only during an online session. They disappear from your computer when you close your browser software or turn off your computer. Persistent cookies remain on your computer after you've closed your browser or turned off your computer. They include such information as a unique identifier for your browser.

Salesforce.com uses session cookies containing encrypted information to allow the system to uniquely identify you while you are logged in. This information allows salesforce.com to process your online transactions and requests. Session cookies help us make sure you are who you say you are after you've logged in and are required in order to use the salesforce.com application. Salesforce.com uses persistent cookies, that only salesforce.com can read and use, to identify the fact that you are a salesforce.com customer or prior salesforce.com Website visitor (whatever the case may be). We are especially careful about the security and confidentiality of the information stored in persistent cookies. For example, we do not store account numbers or passwords in persistent cookies. Users who disable their Web browsers' ability to accept cookies will be able to browse our Website but will not be able to successfully use our Service.

Third Party Cookies: We may from time to time engage third parties to track and analyze non-personally identifiable usage and volume statistical information from visitors to our website to help us administer our website and improve its quality. Such third parties may use cookies to help track visitor behavior. Such cookies will not be used to associate individual website visitors to any personally identifiable information. All data collected by such third parties on behalf of salesforce.com is used only to provide us with information on site usage and is not shared with any other third parties.

Third-Party Sites:
The Site contains links to other web sites. Salesforce.com is not responsible for the privacy practices or the content of these other web sites. Customers and visitors will need to check the policy statement of these others web sites to understand their policies. Customers and visitors who access a linked site may be disclosing their private information. It is the responsibility of the user to keep such information private and confidential.

Security:
Our Site has security measures in place to help protect against the loss, misuse, and alteration of the Data under our control. When our Site is accessed using Netscape Navigator, or Microsoft Internet Explorer versions 5.5 or higher, or Mozilla Firefox 1.0 , Secure Socket Layer (SSL) technology protects information using both server authentication and data encryption to help ensure that Data is safe, secure, and available only to you. Salesforce.com also implements an advanced security

CONFIDENTIAL



## MASTER SUBSCRIPTION AGREEMENT

method based on dynamic data and encoded session identifications, and hosts the Site in a secure server environment that uses a firewall and other advanced technology to prevent interference or access from outside intruders. Finally, salesforce.com provides unique user names and passwords that must be entered each time a customer logs on. These safeguards help prevent unauthorized access, maintain data accuracy, and ensure the appropriate use of Data.

**Opt-Out Policy:**
Salesforce.com offers its visitors and customers a means to choose how we may use information provided. If, at any time after registering for information or ordering the Service, you change your mind about receiving information from us or about sharing your information with third parties, send us a request specifying your new choice. Simply send your request to support@salesforce.com.

**Correcting & Updating Your Information:**
If customers need to update or change registration information they may so by editing the user or organization record. To update a User Profile, log on to salesforce.com and select Setup to add or update information. To update Organization's data, log on to salesforce.com and select Organization Setup. To update billing information please email support@salesforce.com or call 415-901-7010. To discontinue the Service and to have data returned, email support@salesforce.com or call 415-901-7010. Salesforce.com will respond to your correction or update request within at most 30 days from the date of your request.

**Additional Information:**
Questions regarding this Statement or the practices of this Site should be directed to salesforce.com's Security Administrator by e-mailing such questions to security@salesforce.com or by regular mail addressed to salesforce.com, inc., Attn: Security Administrator, The Landmark @ One Market, Suite 300, San Francisco, CA 94105.

# GROWTHCIRCLE ⭕

## Professional Services Agreement

This Professional Services Agreement ("Agreement") is between GrowthCircle LLC ("Consultant") and The Computer Merchant LTD. ("Customer"). Specific Professional Services to be provided to Customer, and Customer's payment obligations for same, shall be set forth in one or more Statements of Work hereunder.

### 1. Definitions

#### 1.1. "Professional Services"

Shall mean work performed by Consultant for Customer pursuant to a Statement of Work under this Agreement.

#### 1.2. "Statement of Work"

Shall mean Consultant's standard form for ordering Professional Services (entitled "Statement of Work"), which has been completed and executed by both parties, and which specifies the scope and schedule of Professional Services to be performed by Consultant for Customer and the applicable fees. Each Statement of Work hereunder shall be governed by the terms of this Agreement and shall reference the Effective Date specified below.

### 2. Ordering, Charges, Payment, Taxes

#### 2.1. Who May Order

Customer or a wholly owned subsidiary of Customer (each a "Customer Entity") may obtain Professional Services from Consultant under this Agreement in the United States. By signing a Statement of Work, a Customer Entity agrees that any Professional Services obtained pursuant to the Statement of Work are subject solely to the provisions of this Agreement and the Statement of Work. Customer represents and warrants that any Customer Entity who purchases Professional Services shall perform its obligations in accordance with the terms and conditions of this Agreement and the relevant Statement of Work.

#### 2.2. Fees for Professional Services

Unless otherwise expressly stated in the applicable Statement of Work, Professional Services shall be provided on a time and materials ("T&M") basis at Consultant's then current T&M rates at the time the Professional Services are performed. If a dollar amount is stated in the applicable Statement of Work for T&M Professional Services, that amount shall be deemed solely an estimate for Customer's budgeting and Consultant's resource scheduling purposes. In the event that the estimated amount is expended, Consultant will continue to provide Professional Services on a T&M basis under the terms of the applicable Statement of Work.

#### 2.3. Incidental Expenses

Customer shall reimburse Consultant for material(s) and reasonable travel, administrative, and out-of-pocket expenses incurred in conjunction with the Professional Services.

#### 2.4. Invoicing and Payment

Consultant shall invoice Customer monthly, unless otherwise expressly stated in the applicable Statement of Work. Charges shall be due and payable thirty (30) days from the date of the invoice and shall be deemed overdue if unpaid thereafter. Except for charges being disputed reasonably and in good faith, amounts remaining unpaid after the due date shall be subject to interest at 1.5% per month, or the highest rate allowed by law if lower, from the due date until the amounts are paid. Customer shall issue a purchase order, or alternative document acceptable to Consultant, on or before commencement of Professional Services under the applicable Statement of Work.

#### 2.5. Taxes

Charges for Professional Services hereunder do not include any federal, state, local or foreign taxes, duties or levies of any nature ("Taxes"). Any Taxes required to be paid by Consultant as a result of the Professional Services rendered hereunder (other than Taxes based on Consultant's income) shall be billed to and paid by Customer.

### 3. Contract Property

#### 3.1. Contract Property

Consultant hereby grants Customer a worldwide, perpetual, non-exclusive, non-transferable, royalty-free license to use for its internal business purposes anything developed by Consultant for Customer under this Agreement ("Contract Property"). Consultant shall retain all ownership rights to the Contract Property.

#### 3.2. Relationship to Online Service

| GC PSA | GrowthCircle Confidential | Page 1 of 5 |

*Ex. B*

**GROWTHCIRCLE** ○

The Professional Services provided under this Agreement may be in support of Customer's license, under a separate agreement, to use Consultant's online CRM services. Such separate agreement shall govern all use by Customer of such online services. Neither this Agreement nor any Statement of Work hereunder grants Customer any license or rights to use such online services.

## 4. Term and Termination

### 4.1. Term

This Agreement shall commence on the Effective Date and shall remain in effect until terminated in accordance with this Section 4.

### 4.2. Termination for Convenience

Customer may terminate this Agreement and/or any Statement of Work hereunder at any time by providing Consultant with thirty (30) days prior written notice. Consultant may terminate this Agreement at any time by providing Customer with thirty (30) days prior written notice; provided, however, that any Statement of Work outstanding at the time of such a termination by Consultant shall continue to be governed by this Agreement as if it had not been terminated.

### 4.3. Termination for Material Breach

Either party may terminate this Agreement and/or any Statement of Work hereunder if the other party is in material breach of this Agreement or such Statement of Work and has not cured such breach within thirty (30) days of written notice specifying the breach. Consent to extend the cure period shall not be unreasonably withheld, so long as the breaching party has commenced cure during the thirty (30) day period and is pursuing such cure diligently and in good faith.

### 4.4. Failure to Make Payment

Notwithstanding anything in this Section 4 to the contrary, if Customer fails to make payment on any due date, Consultant shall have the right to immediately cease all Professional Services hereunder and, if such failure to make payment has not been cured within thirty (30) days of the due date, immediately upon written notice terminate this Agreement and any or all outstanding Statements of Work hereunder.

### 4.5. Termination for Insolvency

Either party may terminate this Agreement immediately upon written notice if the other party enters into insolvency or bankruptcy proceedings of any sort.

### 4.6. Effect of Termination

Termination of this Agreement and/or any Statement of Work hereunder shall not limit either party from pursuing any other remedies available to it, including injunctive relief, nor shall termination relieve Customer of its obligation to pay all charges and expenses accruing prior to such termination. The parties' rights and obligations under Sections 4, 5 and 6, shall survive termination of this Agreement and/or any Statement of Work hereunder.

## 5. Indemnity, Warranty, Remedy, Limitation of Liability

### 5.1. Indemnity

**A.** Each party ("Provider") shall defend and indemnify the other party ("Recipient") against any claim that any information, design, specification, instruction, software, data or material furnished by the Provider ("Material") and used by the Recipient in connection with the Professional Services infringes a copyright, patent or other intellectual property right of a third party, provided that: (a) Recipient notifies Provider in writing within thirty (30) days of the claim; (b) Provider has sole control of the defense and all related settlement negotiations; and (c) Recipient provides Provider with the assistance, information and authority reasonably necessary to perform the above. Reasonable out-of-pocket expenses incurred by Recipient in providing such assistance shall be reimbursed by Provider.

**B.** Provider shall have no liability for any claim of infringement resulting from: (a) Recipient's use of a superseded or altered release of some or all of the Material if infringement would have been avoided by the use of a subsequent or unaltered release of the Material which was provided to Recipient; or (b) any information, design, specification, instruction, software, data or material not furnished by Provider.

**C.** In the event that some or all of the Material is held or is reasonably believed by Provider to infringe the intellectual property rights of a third party, Provider shall have the option, at its expense, (a) to modify the Material to be non-infringing; (b) to obtain for Recipient a license to continue using the Material; or (c) to require return of the infringing or potentially infringing Material and all rights thereto from Recipient. If Provider is Consultant and such return materially affects Customer's ability to meet its obligations

# GROWTHCIRCLE

under the relevant Statement of Work, then Customer may, at its option and upon thirty (30) days prior written notice to Consultant, terminate such Statement of Work, in which case Customer shall be entitled to recover the fees paid for that portion of the Material. If Customer is the Provider and such return materially affects Consultant's ability to meet its obligations under the relevant Statement of Work, then Consultant may, at its option and upon thirty (30) days prior written notice to Customer, terminate such Statement of Work, in which case Customer shall pay Consultant for Professional Services rendered through the date of termination on a T&M or percent of completion basis as appropriate.

### 5.2. Warranty and Disclaimers

**A. Consultant warrants that the Professional Services will be performed in a professional and workmanlike manner, in accordance with generally accepted industry standards.**

**B. Customer must report any deficiencies in the Professional Services to Consultant in writing within ninety (90) days of performance of such services in order to receive warranty remedies.**

**C. This warranty is exclusive and in lieu of all other warranties, whether express or implied, including any implied warranties of merchantability or fitness for a particular purpose.**

### 5.3. Warranty Remedy

For any breach of the warranty in Section 5.2, Customer's exclusive remedy, and Consultant's entire liability, shall be the re-performance of the Professional Services. If Consultant is unable to re-perform the Professional Services as warranted, Customer shall be entitled to recover the fees paid to Consultant for the deficient Professional Services.

### 5.4. Limitation of Liability

**In no event shall either party be liable for any indirect, incidental, special, consequential, reliance or cover damages, or damages for loss of profits, revenue, data or use, incurred by either party or any third party, whether in action in contract or tort, even if the other party or any other person has been advised of the possibility of such damages. Neither party's aggregate liability for damages hereunder shall exceed the total amount of fees paid and/or due by Customer under the applicable Statement of Work.**

## 6. General

### 6.1. Cooperation

Customer acknowledges that the timely provision of, and Consultant's access to, office accommodations, facilities, equipment, assistance, cooperation, complete and accurate information and data from its officers, agents and employees, and suitably configured computer products are essential to satisfactory and timely performance of the Professional Services. Consultant will not be responsible for any delays due to changes to relevant requirement(s), project plan(s), schedule(s), scope, specification(s), design(s), software, hardware product(s), or related system environment(s) or architecture unless Customer and Consultant specifically consent to such changes in writing.

### 6.2. Confidentiality

"Confidential Information" shall mean all confidential or proprietary information disclosed orally or in writing by one party to the other that is identified as confidential or whose confidential nature is reasonably apparent. Confidential Information shall not include information which: (a) is or becomes a part of the public domain through no fault of the receiving party; (b) was in the receiving party's lawful possession prior to the disclosure; (c) is lawfully disclosed to the receiving party by a third party without restriction on disclosure or any breach of confidence; (d) is independently developed by the receiving party; or (e) is required to be disclosed by law. Each party agrees to hold the other's Confidential Information in confidence, and not to use or disclose such Confidential Information other than in connection with performance of obligations hereunder.

### 6.3. Changes to Scope

Any change(s) to the scope of work under a Statement of Work shall be made by written amendment to the Statement of Work signed by an authorized representative of each party prior to implementation of the change(s).

### 6.4. Relationship Between the Parties

Consultant is an independent contractor; nothing in this Agreement shall be construed to create a partnership, joint venture or agency relationship between the parties. Each party shall be solely responsible for payment of all compensation owed to its employees, as well as all employment-related taxes. Each party shall

| GC PSA | GrowthCircle Confidential | Page 3 of 5 |
| --- | --- | --- |

**GROWTHCIRCLE**

maintain appropriate worker's compensation and general liability insurance for its employees.

### 6.5. Governing Law

This Agreement shall be governed by the internal laws of the State of California.

### 6.6. Jurisdiction and Venue

Any legal action or proceeding relating to this Agreement shall be instituted in a state or federal court in San Francisco County, California. Consultant and Customer agree to submit to the jurisdiction of, and agree that venue is proper in, said courts.

### 6.7. Notice

All notices, including notices of address change, required to be sent hereunder, shall be in writing and shall be deemed to have been given when mailed by first class mail to the first address listed in the applicable Statement of Work (if to Customer) or to Consultant's address on the Statement of Work (if to Consultant).

### 6.8. Severability

In the event any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect.

### 6.9. Waiver

The waiver by either party of any default or breach of this Agreement shall not constitute a waiver of any other or subsequent default or breach. Except for actions for nonpayment or breach of either party's intellectual property rights, no action, regardless of form, arising out of this Agreement may be brought by either party more than one (1) year after the cause of action has accrued.

### 6.10. Export Administration

Each party agrees to comply with all relevant export laws and regulations of the United States.

### 6.11. Entire Agreement

This Agreement constitutes the complete agreement between the parties and supersedes all previous and contemporaneous agreements, proposals or representations, written or oral, concerning the subject matter thereof. Neither this Agreement nor any Statement of Work hereunder may be modified or amended except in a writing signed by a duly authorized representative of each party. It is expressly agreed that any terms and conditions that may be attached to Customer's purchase order, whenever received by Consultant, shall be null and void and superseded in full by the terms of this Agreement and the applicable Statement of Work.

### 6.12. Subcontractors

Consultant may, in its absolute discretion, use third party contractors to perform any of its obligations under this Agreement.

### 6.13 Assignment.

Neither party may assign any of its rights or obligations hereunder, whether by operation of law or otherwise, without the prior express written consent of the other party. Notwithstanding the foregoing, either party may assign this Agreement together with all rights and obligations hereunder, without consent of the other party, in connection with a merger, acquisition, corporate reorganization, or sale of all or substantially all of its assets not involving a direct competitor of the other party. Any attempt by a party to assign its rights or obligations under this Agreement in breach of this section shall be void and of no effect. Subject to the foregoing, this Agreement shall bind and inure to the benefit of the parties, their respective successors and permitted assigns

| GC PSA | GrowthCircle Confidential | Page 4 of 5 |

# GROWTHCIRCLE

## 7. Signatures

The Effective Date of this Agreement shall be _June 9, 2006_

IN WITNESS WHEREOF, the parties have caused this Professional Services Agreement to be executed by
their duly authorized representatives as identified below.

Customer: The Computer Merchant Ltd                    Consultant: GrowthCircle LLC

| Authorizing Signature | _Angela M Powell_ |
|---|---|
| Name | Angela M Powell |
| Address | 95 Longwater Circle Norwell, MA 02061 |
| Title | VP / CFO |
| Date | 6/9/06 |

| Authorizing Signature | _signature_ |
|---|---|
| Name | Lew Costner |
| Address | 8 Faneuil Hall MKPI Boston, MA |
| Title | MANAGING PARTNER |
| Date | 6/13/06 |

PROOF OF SERVICE

STATE OF CALIFORNIA          )
                            )ss.
COUNTY OF LOS ANGELES        )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years and not a party to the within action; my business address is 5757 West Century Boulevard, 7th Floor, Los Angeles, California 90045.

On August $\cancel{H}$, 2007, I served the foregoing document described as **COUNTERCLAIMS OF THE COMPUTER MERCHANT, LTD AGAINST SALESFORCE.COM, INC. AND ASTADIA CONSULTING, LLC** on the interested parties in this action by placing a true and correct copy thereof enclosed in a sealed envelope addressed as follows:

Robert T. Sullwold
James A. Hughes
Sullwold & Hughes
235 Montgomery St., #730
San Francisco, CA 94104

_X__   By Mail: I caused such envelope to be deposited in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

____   By Federal Express-Overnight: I caused such envelope to be deposited in a box or other facility regularly maintained by Federal Express in an envelope or package designated by Federal Express with delivery fees paid.

____   By Fax: I served a true copy of the document(s) described on all parties to this action by fax transmission, and the transmission was reported as complete and without error. Fax transmissions were sent and addressed as stated above.

____   By Personal Service: I caused such envelope to be delivered by hand to the offices of the addressees.

I declare that I am employed in the office of a member of the bar of this court at whose direction service was made.

Executed on August _14_, 2007, at Los Angeles, California.

Jinx J. Clark

Gallo & Associates
5757 W. Century Blvd., Suite 700
Los Angeles, CA 90045
(310) 338-1114